HENRY FENTON (State Bar No. 45130)
hfenton@fentonlawgroup.com
NICHOLAS JURKOWITZ (State Bar No. 261283)
njurkowitz@fentonlawgroup.com
DENNIS E. LEE (State Bar No. 164360)
dlee@fentonlawgroup.com
**FENTON LAW GROUP, LLP**
1990 S. Bundy Drive, Suite 777
Los Angeles, CA 90025
Telephone: (310) 444-5244
Facsimile: (310) 444-5280

Attorneys for Plaintiff
BARON AND BARON MEDICAL CORP.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARON AND BARON MEDICAL CORP., <br><br>             Plaintiff, <br><br>    vs. <br><br> ERIC HARGAN, ACTING SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, <br><br> SEEMA VERMA, ADMINISTRATOR OF THE CENTERS FOR MEDICARE & MEDICAID SERVICES, <br><br> and <br><br> NORIDIAN HEALTHCARE SOLUTIONS, LLC, MEDICARE ADMINISTRATIVE CONTRACTOR FOR CALIFORNIA, <br><br><br>             Defendant(s). | Case No.:  **'17CV2133 DMS JLB** <br><br><br> **COMPLAINT FOR INJUNCTIVE RELIEF** <br><br> Count I: No Review At All (*Illinois Council* Exception) <br><br> Count II: Mandamus Relief <br><br> Count III: Procedural Due Process (*Mathews v. Eldridge* Waiver) <br><br> Count IV: *Ultra Vires* Action <br><br> Count V: Preservation of Rights under Section 705 of the APA |

- 1 -
COMPLAINT FOR INJUNCTIVE RELIEF

NOW INTO COURT, by and through undersigned counsel, comes the Plaintiff, Baron and Baron Medical Corp., hereinafter "Plaintiff," who applies to this Court for injunctive relief as grounds for this Complaint, stating as follows:

## I.     Introduction

1.     This is a civil action by Plaintiff for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction to prevent Defendants from putting Plaintiff out of business and, thus, preventing Plaintiff from providing essential medical services to thousands of elderly patients in California, based on a billing dispute. The billing dispute is premised entirely upon a policy article issued by Plaintiff's Medicare Administrative Contractor, Noridian Healthcare Solutions, LLC, which improperly exclude the Clarivein Procedure ("Clarivein") from being billed under CPT billing code 37241.

2.     Clarivein is a relatively new technique to treat venous reflux disease of superficial axial veins (e.g., great saphenous vein, "GSV," small saphenous vein, "SSV," or duplicated great saphenous vein) by occluding these veins, thereby stopping reflux. Other occlusion techniques include radiofrequency and laser ablation which use heat and are very painful due to the need for tumescent anesthetic. Clarivein is the only minimally-invasive catheter-based hybrid technique available which combines both mechanical and chemical modalities for occlusion after embolization; this hybrid approach does not require tumescent anesthetic and so is greatly preferred by patients. The absence of heat also makes the procedure much safer. The critical component of Clarivein is the placement of an embolus in the great saphenous vein just before it enters the femoral vein.

3.     More specifically, Clarivein uses the Seldinger technique to access the vein. This is a highly-specialized technique that allows entry of a catheter into a vessel by first placing a needle into the vessel using radiological ultrasonographic image guidance. Use of ultrasonographic image guidance is critical during this step of the procedure in allowing the surgeon to access the axial superficial vein to be

treated because these veins are too deep to be seen visually and no other image modality (other than venous ultrasound) allows for safe, accurate percutaneous venous entry into the vein.  Next, a guide wire is placed through the needle (again, using radiological ultrasonographic image guidance).  A vessel dilator, surrounded by a sheath, is placed over this guide wire into the vessel using radiological ultrasonographic image guidance.  The guide wire and dilator are thereafter removed, leaving the sheath inside the vein.  This sheath now allows for venous access to the vascular specialist for advancement of the specialized Clarivein catheter.

4.     Using careful, meticulous techniques and intraprocedural real-time ultrasonographic radiological image guidance, the catheter is advanced to the point needed to treat the entire diseased vein based on the intraprocedural roadmapping that was performed prior to gaining venous access and based on the patient's unique clinical presentation and preoperative venous duplex ultrasonographic insufficiency examination.  The sheath then permits precise application of a rotating wire in conjunction with a chemical agent at the correct location to damage endothelial cells in the vein sufficiently to result in occlusion.

5.     In summary, the ClariVein procedure differs from other vascular occlusion procedures in that it involves precise localization and application of a combination of mechanical and chemical means of occlusion.  Older techniques include "vein stripping" which is purely mechanical, whereas newer techniques such as radiofrequency and laser application are also essentially mechanical, albeit using heat.  Sclerotherapy, which involves simple use of a chemical occluding agent only, is a much simpler procedure that is typically reserved only for the most superficial veins, known as "tributary" veins.

6.     As will be discussed in greater detail herein, this action concerns a billing dispute concerning the propriety of using CPT Code 37241 for the Clarivein Procedure.  CPT Code 37241 applies to:

Vascular embolization or occlusion, inclusive of all radiological supervision and interpretation, intraprocedural roadmapping, and imaging guidance necessary to complete the intervention; venous, other than hemorrhage (e.g., congenital or acquired venous malformations, venous capillary hemangiomas, varices, varicoceles.)

The description under CPT Code 37241 precisely describes Clarivein: vascular occlusion via intraprocedural roadmapping and imaging guidance. Clarivein also happens to make use of both mechanical and chemical modalities, whereas most other techniques use only one or the other.

7.     Plaintiff is but one of a number of providers who have been using the Clarivein procedure to treat venous reflux disease and billing for the procedure under CPT Code 37241, in part based on assurances from the device manufacturer as to the propriety of that billing code.

8.     The present demand for overpayment has arisen from a recent determination by Defendant Noridian Healthcare Solutions, LLC ("Noridian"), a for-profit North Dakota corporation that has contracted with CMS to act as the fiscal intermediary for the state of California, that the Clarivein procedure should instead have been billed under one of several general (and, Plaintiff contends, entirely inapplicable) CPT Codes providing far lower reimbursement. _All_ of the alleged overpayment in the present case relates solely to Plaintiff's use of the Clarivein procedure and billing for it under CPT Code 37241 instead of under one of the generic CPT Codes urged by Noridian. The details of this billing dispute are discussed in greater detail in paragraphs 61-70, _infra_.

9.     Absent intervention by this tribunal, Plaintiff will suffer irreparable harm and will be forced out of business.  In addition, Plaintiff's many patients will lose their longstanding provider whom they know and trust.

10.     Plaintiff does not ask this Court to usurp the power of the ALJ to decide any issue with respect to the billing dispute on the merits, nor of CMS to review the ALJ's decision.  Plaintiff is vigorously challenging the billing dispute on the merits through the administrative appeals process as expeditiously as an ALJ can accommodate, and Plaintiff fully anticipates prevailing on all or most of the claims at issue.  Plaintiff simply requests that this Court maintain the *status quo* pending completion of the administrative appeals process.  Without injunctive relief, Plaintiff (and its patients) will be irreparably harmed before any meaningful opportunity to obtain the administrative review and judicial review to which they are entitled.

11.     Under law, Medicare is entitled to seek immediate recoupment of alleged overpayment after the second level of the administrative appeal process, reconsideration, is exhausted, as has occurred in the present case.  Without injunctive relief, Plaintiff would be subject to immediate recoupment in the very near future. The total amount that Medicare seeks to recover is about two million dollars.

12.     Failure to grant an injunction to prevent immediate recoupment by Defendants without providing the prompt administrative hearing demanded by statute would violate Plaintiff's procedural due process rights.  If Plaintiff is deprived of Medicare payments while this billing dispute is stuck in a backlog of claims pending before the ALJ, Plaintiff will be irreparably harmed through the destruction of its goodwill and its business.  Additionally, many elderly patients will be forced to find alternative providers with whom they have not developed a close physician-patient relationship and who would be deprived of the high-quality medical care that Plaintiff provides.

13.     Plaintiff has no adequate remedy at law and seeks only to preserve the *status quo* pending the outcome of an administrative hearing.  Plaintiff seeks a Temporary Restraining Order and an injunction preventing Defendants from recouping any disputed claims from Plaintiff until after Plaintiff has been afforded a hearing and decision from an impartial ALJ.

## II.     The Parties

14.     Dr. Norman Baron has practiced as a physician and surgeon in Brawley, California since 1976.  He established the Plaintiff, Baron and Baron Medical Corp., a medical corporation, in 2004 and, since then, has practiced through his medical corporation.  Dr. Baron is currently 73 years old.  In or about 2006 or 2007, Plaintiff set up the Desert Vein Clinic in Brawley which was, and still is, one of the only providers of vascular services in the geographic area.  Brawley is about 120 miles away from the nearest major city, San Diego, and is an underserved, largely low-income community with a significant elderly population.  According to the U.S. Census Bureau, the median household income in Brawley is $37,637 and 25.2 percent of the population lives below the poverty line.

15.     In or about 2009, Dr. Baron began to focus his medical practice primarily on vascular surgery at the Desert Vein Clinic ("DVC").  Most of Dr. Baron's patients with DVC were low-income and about 60 percent were Medicare patients, about 30 percent were Medi-Cal, and the remainder used private insurance. In or about late 2013, Dr. Baron began using the Clarivein procedure, which was a great improvement for his patients with venous reflux disease in that it resulted in far less discomfort than other vascular occlusion procedures, as discussed at paragraphs 2-5, *supra*.

16.     All of the Clarivein procedures performed by Plaintiff occurred at the Desert Vein Clinic.  Plaintiff sold DVC to third parties in March 2016, and none of DVC's subsequent services are at issue here.  Until recently, Dr. Baron was interested in opening a new vein clinic in the near future to treat some of his former patients who have not been happy with the new management of DVC, but he has been stymied by the current overpayment demand.

17.     As noted, Plaintiff has not used the Clarivein procedure since March 2016.  However, about 80 percent of Dr. Baron's <u>current</u> practice with the Wound Care Center at Pioneer Memorial Health Care District in Brawley consists of

Medicare patients.  If immediate recoupment is not enjoined pending the ALJ hearing, he will be fired and lose his only source of income, which he and his wife critically rely on.  In addition, all of his patients, many of whom have been his patients for years, would be forced to change providers.   See 42 C.F.R. section 405.370 (defining recoupment as "[t]he recovery by Medicare of any outstanding Medicare debt by reducing present or future Medicare payments and applying the amount withheld to the indebtedness.")  He and his wife will also likely lose their entire retirement savings if an injunction does not issue.

18.    Defendant Eric Hargan is named only in his official capacity as the Acting Secretary of the United States Department of Health and Human Services ("DHHS"), the agency that administers the Medicare Act, 42 U.S.C. §§ 1395 *et seq*.

19.    The Secretary delegates the administration of the Medicare Act to the Centers for Medicare and Medicaid Services ("CMS").  Defendant Seema Verma is named only in her official capacity as the Administrator of CMS.

20.    CMS contracts with private insurance companies to perform administrative functions for Medicare.  Medicare Administrative Contractors ("contractors") process claims, determine whether services are covered by Medicare, and determine the amount of payment for services furnished, among other duties.  As noted, Defendant Noridian Healthcare Solutions, LLC ("Noridian"), is a for-profit North Dakota corporation that has contracted with CMS to act as the contractor and fiscal intermediary for the state of California.

21.    Although not named as a Defendant in this action, Safeguard Services, LLC (Safeguard) is a for-profit Pennsylvania corporation that has been awarded a Zone Program Integrity Contract ("ZPIC") from the Secretary to act as a bounty hunter and to identify fraud, waste, and abuse within the Medicare program.  In 2012, a ZPIC's average government contract was valued at $81.9 million.  Overzealous ZPIC's, anxious to demonstrate financial return on the government's investment with them coupled with a lack of CMS oversight of ZPICs has resulted in a very high

1  reversal rate of ZPIC overpayment allegations at the ALJ level of administrative

2  Medicare appeals.

3          **III.    Jurisdiction and Venue**

4       22.   This action arises under the Social Security Act, 42 U.S.C. §§ 301, *et*

5  *seq*., implicating the Medicare Act, 42 U.S.C. §§ 1395 *et seq*., as well as the Fifth

6  Amendment to the United States Constitution.

7       23.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331,

8  28 U.S.C. § 1361 (mandamus), 28 U.S.C. § 1651 (all writs act), 42 U.S.C. § 405, 42

9  U.S.C. § 1395ii, and under the Court's general equity powers.  Plaintiffs are also

10  entitled to the judicial relief they seek pursuant to the Administrative Procedures Act,

11  5 U.S.C. § 705.

12       24.   Although Plaintiff is challenging the billing dispute through the

13  administrative process, the ALJs of CMS have no authority to issue an injunction and

14  lack the power to maintain the *status quo* pending a final decision.  Accordingly,

15  there is no administrative mechanism through which Plaintiff can obtain the relief

16  that it seeks here which is solely to defer immediate recoupment of the amounts at

17  issue in the billing dispute until after Plaintiff has had the opportunity for a hearing

18  before a fair and impartial ALJ.

19       25.   This Court has jurisdiction over this action under 28 U.S.C. § 1331

20  pursuant to the "no review" exception to the usual requirement of exhaustion of

21  administrative remedies.  Exhaustion of administrative remedies under the Medicare

22  Act is not required where exhaustion would mean "no review at all" or "the practical

23  equivalent of total denial of judicial review."  *Shalala v. Illinois Council on Long*

24  *Term Care, Inc.*, 529 U.S. 1, 19, 120 S.Ct. 1084, 1097 (2000) ("*Illinois Council*").

25       26.   If this court does not issue injunctive relief, Plaintiff and its patients will

26  have no review at all before irreparable harm takes place and, once the irreparable

27  harm takes place, the theoretically available administrative remedies will be too late

28  and of no value.

27.    Due to the amount that Defendants seek to recoup and the lengthy delay before a hearing can be held before, and decided by, an impartial ALJ, probably at least four or more years in the future, Plaintiff is facing the practical equivalent of a total denial of administrative or judicial review because the pre-hearing recoupment would certainly put Plaintiff out of business long before any ALJ hearing takes place.

28.    Plaintiff is not seeking damages in this action for events that have already occurred.  Plaintiff does not seek this Court's determination of the merits of the underlying billing dispute.  This action is solely about Plaintiff's survival and ability to continue its operations, and whether the government can engage in self-help recoupment that would financially ruin Plaintiff when (a) the purported overpayment determinations made by entities with a financial incentive to overstate overpayments are likely to be overturned by an ALJ and (b) the government is unable to provide Plaintiff with timely access to an ALJ as it is required to do by statute.

29.    Further, this Court has jurisdiction over this action under 28 U.S.C. § 405 pursuant to the "waiver" exception to the usual requirement of exhaustion of administrative remedies.  Plaintiff has appealed and requested a hearing before an ALJ to demonstrate *inter alia* that billing for Clarivein under CPT Code 37241 was correct and valid, and that Plaintiff performed medically necessary services.  Exhaustion of administrative remedies under the Medicare Act is not required where a plaintiff's interest in having a particular issue resolved promptly is so great that the requirement is considered waived.  Plaintiff's interest in having its claims resolved promptly is so great that the requirements should be deemed waived.

30.    Plaintiff's request for an injunction based on the claims asserted herein is "collateral" to Plaintiff's substantive claims in connection with the billing dispute.  Plaintiff does not ask this Court to resolve the merits of the underlying billing dispute in this action.  It merely requests that this Court, based on procedural due process considerations, preclude Defendants from engaging in self-help recoupment based on

preliminary and disputed determinations until after Plaintiff has been afforded the opportunity to obtain a ruling from an impartial and unbiased ALJ.

31.     More importantly, the self-help remedy of recoupment that Defendants intend to implement years in advance of Plaintiff's first opportunity to present its case to an impartial and unbiased ALJ would harm Plaintiff irreparably, and the facts of this case gives rise to a sufficient threat of irreparable harm so as to justify waiver of the administrative exhaustion requirement.  Recoupment of 100% of Plaintiff's future Medicare payments would result in immediate irreparable harm to Plaintiff, through destruction of its goodwill and business, and also would harm the vulnerable communities that Plaintiff serves.  Plaintiff could not obtain full relief at a post-recoupment hearing.

32.     The irreparable harm alleged in this Complaint would ensue from subjecting Plaintiff to recoupment relating to a billing dispute on which Plaintiff is likely to substantially prevail before Plaintiff is afforded its first opportunity for hearing before, and decision by, a fair and impartial ALJ – a backlogged process that currently takes at least four or more years, rather than the 90 days required by statute. Thus, an injunction would protect the rights of Plaintiff, its patients, their families, and the elderly communities Plaintiff serves pending completion of the full administrative process.  In light of the serious and substantial threat of unwarranted and irreparable harm to Plaintiffs, their patients, and their families, Plaintiff's interest in having a determination of its right to injunctive relief is so great that deference to CMS's desire to deprive Plaintiff and its patients of protection pending exhaustion of the administrative process is inappropriate.

33.     Without protection of injunctive relief, and in light of the backlog of at least four or more years to obtain a hearing before, and decision by, an ALJ, Plaintiff would have no practical opportunity to ever present its case to an impartial ALJ. Long before Plaintiff could even get to a hearing before an ALJ, much less have an opportunity to complete the administrative process, and to appeal any adverse

1  decision to the federal courts, Plaintiff would have been deprived of years of

2  Medicare revenues and would already be closed, and all of its patients and their

3  families would have been forced to search elsewhere for medical services.

4      34.    Pursuant to 28 U.S.C. § 1361, "The district courts shall have original

5  jurisdiction of any action in the nature of mandamus to compel an officer or

6  employee of the United States or any agency thereof to perform a duty owed to the

7  plaintiff."  This action is brought to compel the Secretary, an officer of the United

8  States, to perform duties owed to Plaintiffs, namely to provide a timely hearing

9  before a fair, unbiased, and impartial ALJ, and thus provides a basis for jurisdiction.

10     35.    In *Briggs v. Sullivan*, 886 F.2d 1132, 1142 (9th Cir. 1989), the Ninth

11 Circuit Court of Appeals held that 42 U.S.C. § 405(h) does not preclude mandamus

12 jurisdiction to review otherwise unreviewable procedural issues.  This result is nearly

13 unanimous among all Circuits, as noted in *Randall D. Wolcott, M.D., P.A. v.*

14 *Sebellius*, 635 F.3d 757, 765 (5th Cir. 2011) (citing *Briggs* among other cases and

15 noting that all Circuits except the First and Eleventh have so held, and that both of

16 those Circuits have left open the possibility of so ruling.)

17     36.    Under the Medicare Act, the Defendants have a clear duty to comply

18 with their statutory obligation to provide an ALJ hearing and decision within 90 days

19 of Plaintiffs' request.  Mandamus jurisdiction under 28 U.S.C. § 1361 permits

20 flexibility in remedy, including injunctive relief.  CMS's administrative remedies are

21 not capable of affording full relief as to the subject matter in question, as they do not

22 include either injunctive relief or any way to redress the irreparable harm that

23 Plaintiffs, their patients, and their families will suffer absent injunctive relief.

24     37.    This Court also has jurisdiction under 5 U.S.C. § 705, as a "reviewing

25 court" to "issue all necessary and appropriate process to postpone the effective date

26 of an agency action or to preserve status or rights pending conclusion of the review

27 proceedings."

28

38.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(e)(1) because a substantial part of the events giving rise to the claim occurred in this district.  Venue is proper under 5 U.S.C. § 703.

### IV.     Medicare Coverage of Medical Devices

39.     Established in 1965 under Title XVIII of the Social Securities Act, Medicare is a federally funded health insurance program for the elderly and disabled.  *See* 42 U.S.C. §§ 1395 to 1395kkk-1.  The federal Medicare program reimburses medical providers for services they supply to eligible patients.

40.     The Secretary of Health and Human Services is charged by Congress with administered the Medicare program.  *See* 42 U.S.C. § 1395ff(a)(1).  The Secretary administers Medicare through the Centers for Medicare & Medicaid Services ("CMS").  Before 2001, CMS was called the Health Care Financing Administration ("HCFA").

41.     The Medicare statute is currently divided into five "Parts."  Part A, which is not relevant to this case, covers medical services furnished by hospitals and other institutional care providers.  *See* 42 U.S.C. §§ 1395c to 1395i-5.

42.     Medicare Part B is an optional supplemental insurance program that pays for medical items and services not covered by Part A, including outpatient physician services, clinical laboratory tests, and durable medical equipment.  *See* 42 U.S.C. §§ 1395j to 1395w-6.  All of the services billed by Plaintiffs to Medicare at issue in this case were covered under Medicare Part B.

43.     Medicare Parts C through E are not relevant to the present case.

### V.     The Administrative Appeal Process, Generally

44.     Pursuant to 42 C.F.R. § 405.371(a)(3), a Medicare contractor (Noridian, in the present case) may offset or recoup Medicare payments to a provider upon a determination that the provider has been overpaid.  The contractor issues written notice to the provider of such overpayment determination, typically via a letter.

45.     A provider who is dissatisfied with the initial determination of overpayment by the Medicare contractor may request a redetermination of the claim pursuant to 42 C.F.R. § 405.940.  This Redetermination Request constitutes the first level of administrative appeals, out of a total of four levels.

46.     After a Redetermination Decision is issued, a provider who still disputes the result has the right to request reconsideration by a qualified independent contractor (QIC) pursuant to 42 C.F.R. § 405.960.  A Request for Reconsideration is the second level of administrative appeals out of a total of four such levels.

47.     Even though there are two additional levels of administrative appeals after a Request for Reconsideration is decided, the contractor is immediately permitted to recoup any alleged overpayment after a Reconsideration Decision becomes final.  42 C.F.R. § 405.379(f).  As discussed further herein, the two additional levels of administrative appeals, despite statutory and regulatory mandates for speedy determination, are typically not resolved until some four or more years. That is the situation currently faced by the Plaintiff in the instant case, who would be completely financially destroyed before ever exhausting his remedies.

48.     Following a Reconsideration Decision, the provider may request a hearing before an Administrative Law Judge ("ALJ"), which constitutes the third level of administrative review.  *See* 42 C.F.R. § 405.1000 *et seq*.  Upon the filing of a timely request for ALJ hearing, the provider has the right to such hearing within ninety (90) days of the provider's request for a hearing.  42 U.S.C. § 1395ff(d)(1)(A); 42 C.F.R. § 405.1016.  However, despite this statutory and regulatory right to an expeditious hearing, chronic backlogs in the administrative review process have become so intractable that a provider must typically wait some 3.5 or more years before even getting to an ALJ and likely four or more years before obtaining an ALJ decision.  The fourth level of administrative review is to the Medicare Appeals Council ("MAC").

49.     If an ALJ has not held a hearing and rendered a decision within ninety days, a provider may bypass the ALJ level by escalating its claim directly to the Medicare Appeals Council within the Department Appeals Board of the Department of Health and Human Services.  42 U.S.C. § 1395ff(d)(3)(A); 42 C.F.R. § 405.1104. In such situations, the QIC's Reconsideration Decision becomes the decision subject to Medicare Appeals Council review.  42 C.F.R. § 405.1104(b)(3); 42 C.F.R. § 405.1108(d).  The Medicare Appeals Council may conduct additional proceedings, including a hearing, but (unlike at the ALJ level) is not required to do so.  42 C.F.R. § 405.1108(d)(2).  In fact, at the Office of Medicare Hearings and Appeals (OMHA) Medicare Appellant Forum in 2014, the Chair of the DHHS Departmental Appeals Board, Judge Constance Tobias, has explained that, in escalation situations, the Medicare Appeals Council will "NOT hold a hearing or conduct oral argument unless there is an extraordinary question of law/policy/fact" but rather will "[r]eview the QIC's decision *de novo*."  OMHA Medicare Appellant Forum Presentation by Judge Constance B. Tobias, Chair, HHS Department Appeals Board, p. 16 (hereafter "Tobias Presentation"); *see also Art of Healing Medicine, P.C. v. Burwell*, 91 F.Supp.3d 400, 412 (E.D.N.Y. 2015) (in provider appeal escalated directly to Appeals Council from the reconsideration level, Appeals Council did not provide a hearing.)

50.     Not surprisingly, very few providers take this route of escalation because the absence of a hearing greatly limits a provider's procedural due process rights and ability to fully and fairly present its case.

51.     The Medicare Appeals Council has 180 days in which to act on an escalation request, rather than its usual ninety.  42 C.F.R. § 405.1100(c)-(d).

52.     If the Medicare Appeals Council has not rendered a decision within ninety days on its review of an ALJ's decision, a provider may bypass the Medicare Appeals Council and seek judicial review.  42 U.S.C. § 1395ff(d)(3)(B); 42 C.F.R. § 405.1132.  In cases of an initial escalation past the ALJ level, a provider may escalate the appeal to federal court if the Medicare Appeals Council fails to render a decision

within 180 days.  42 C.F.R. § 405.1132; 42 C.F.R. § 405.1100(d).  In the event of this "double escalation," the only agency decision available to the federal court for review is the QIC's Reconsideration Decision, made without a hearing.

53.    If the Medicare Appeals Council reviews the case and issues a decision, and the provider is dissatisfied with the decision, the provider may file suit in Federal district court if the amount remaining in controversy and the other requirements for judicial review are met.  42 C.F.R. § 405.1136 *et seq.*

## VI.    The Secretary Currently Cannot Meet the Statutory 90-Day Hearing Requirement for ALJ Review of QIC Decisions

54.    The statutory time-periods governing the appeals process provide for all levels of administrative review to be completed within about one year, with about half of that time spent on the initial redetermination and reconsideration levels, during which recoupment is stayed.

55.    In practice, however, the time it takes to pursue a claim appeal through HHS far exceeds the timeframes established by the Medicare Act.

56.    Enormous increases in the rates of provider appeals, in large part a by-product of inappropriate denials by over-zealous ZPICs, have caused a massive backlog at the ALJ level of the appeals process.  As of December 2013, the backlog of undecided appeals to the ALJ level had increased from 92,000 claims to over 460,000 in just under two years, and such appeals had languished for an average of sixteen months – approximately thirteen months longer than the ninety-day statutory deadline for a decision – before an ALJ even heard the case.  (Memorandum from Nancy J. Griswold, Office of Medicare Hearing & Appeals, Chief Administrative Law Judge, to OMHA Medicare Appellants (Dec. 24, 2013), p.1).

57.    Since then, delays have gotten even longer.  A document on the current CMS website notes that, from Fiscal Year (FY) 2010 to FY 2015, OMHA experienced an overall 442 percent increase in the number of appeals received annually.  The same document notes that "while the volume of appeals has increased

dramatically, funding has remained comparatively stagnant.  As a result, at the end of FY 2016, 658,307 appeals were waiting to be adjudicated by OMHA and 22,707 appeals were waiting to be adjudicated by the Council.  Under current resource levels (and without any additional appeals), it would take eight years for OMHA and ten years for the council to process their respective backlogs." *Id*.  That document notes, "[a]t level 3 [the ALJ level], OMHA is currently receiving more than a year's worth of appeals every 24 weeks" and noted that "annual adjudicatory capacity going forward was approximately 92,000 appeals" whereas annual adjudicatory capacity for the Council was "approximately 2,600 appeals." *Id*., p. 7.  The document also notes that beneficiaries are given priority over providers in the appeals process. *Id*.

58.     In addition, Plaintiff's counsel received communication from OMHA in an unrelated case in March 16, 2017, that OMHA, at that time, was "currently assigning appeals received between October and December 2013" to ALJs.  This e-mail confirms that, as of early 2017, there was a delay of about 3.5 years between filing of a request for ALJ review and initial assignment to an ALJ.

59.     At the rate OMHA is receiving new appeals, the number of new appeals awaiting assignment will likely continue to grow even higher as time goes on.  However, OMHA's self-imposed deferred assignment and processing delays for appeals does not alter the requirement that a provider appeal from a QIC decision within sixty days, meaning that the backlog at the ALJ level will continue to increase dramatically as appeals continue to roll in without being assigned or decided. *See* 42 U.S.C. § 1395ff(b)(1)(D)(ii); 42 C.F.R. § 405.1013(b)(1).

60.     Plaintiffs can realistically expect to wait at least 3.5 or more years to obtain an ALJ hearing – let alone a decision from the ALJ.

## VII.   THE PRESENT BILLING DISPUTE

61.     This action concerns a billing dispute concerning the appropriateness of utilizing the CPT Code 37241 for the Clarivein Procedure.  CPT Code 37241 applies to the following: "Vascular embolization or occlusion, inclusive of all radiological

supervision and interpretation, intraprocedural roadmapping, and imaging guidance necessary to complete the intervention; venous, other than hemorrhage (e.g., congenital or acquired venous malformations, venous capillary hemangiomas, varices, varicoceles.)"

62.     Plaintiff submitted and received reimbursement for billing utilizing CPT Code 37241 when providing Medicare beneficiaries the Clarivein Procedure.  As explained in detail at paragraphs 2-6 *supra*, the ClariVein procedure involves a combination of mechanical and chemical vascular occlusion pursuant to a precisely localized and guided procedure, and so fits the description of CPT Code 37241.

63.     In or about the end of 2016, Safeguard Services LLC, the Zone Program Integrity Contractor (ZPIC), completed a review of Plaintiff's claims.  By letter dated January 9, 2017, Safeguard issued an overpayment notification concerning the claims at issue in the present case.  Safeguard's letter to Plaintiff noted that, for the audit period from January 1, 2014 to September 27, 2016, approximately $2.2 million had been paid by Medicare under CPT Code 37241 to Plaintiff for the Clarivein procedure, but asserted that Plaintiff should either have been paid nothing at all, or, in some cases, that the correct CPT Code was 36471 for this procedure.  CPT Code 36471 applies to "Injection of sclerosing solution, multiple veins, same leg," a far simpler procedure that reimburses at a far lower rate than 37241.  The ZPIC left it up to the fiscal intermediary (Noridian) to determine the amount of overpayment based on the difference between the rates reimbursable under the different CPT codes.

64.     In response to Plaintiff's Redetermination Requests, Noridian Healthcare Solutions ("Noridian"), Medicare's fiscal intermediary for California, in a series of Redetermination Decisions, essentially upheld the ZPIC's recommendation. Noridian held that the correct code for reimbursement of the Clarivein procedure was either CPT Code 36471 ("Injection of sclerosing solution, multiple veins, same leg"), as recommended by the ZPIC, or, in some cases, CPT Code 36470 ("Injection of

sclerosing solution, single vein"). However, CPT Code 36470 ("… single vein") reimburses at an even lower rate than 36471 ("… multiple veins"), and both CPT Codes 36470 and 36471, which pertain to a fair simpler procedure than Clarivein, reimburse at a far lower rate than CPT Code 37241. Indeed, CPT Codes 36470 and 36471 reimburse at rates so low that they do not even cover Plaintiff's out-of-pocket costs to the manufacturer of the Clarivein device for the product. As a result, the total amount of overpayment sought was not materially affected by any of Noridian's Redetermination Decisions, from Safeguard's initial recommendation.

65. Noridian's overpayment demands and subsequent Redetermination Decisions were tantamount to a nearly complete rejection of Plaintiff's appeals in that CPT Codes 36470 and 36471 reimburse at a minimal rate compared with CPT Code 37241.

66. ZPIC's determination, which was adopted by all of Noridian's initial overpayment determinations and subsequent denials of Redetermination Appeals concerning CPT Code 37241, was based on a **Local Coverage Article (LCA)**, titled "Local Coverage Article for Sclerosing of Varicose Veins (A53084)," which was effective October 1, 2015, and its predecessor (A53144) effective April 1, 2014. These articles were the first to specifically mention the Clarivein procedure. These articles stated, "Noridian has been informed that some providers may have been recommended to use CPT 37241 when using this device for the treatment of varicose veins. This advice is incorrect. CPT 37241 must not be used to bill for the treatment of varicose veins of the lower extremities with this or similar devices." Notably, the articles gave no explanation or rationale for this prohibition on use of CPT Code 37241. LCAs are of not binding on providers, however, nor are they entitled to deference as are Local Coverage Determinations (LCDs). *Finigan v. Burwell*, 189 F.Supp.3d 201, 207-208 (D.Mass. 2016). None of the existing LCDs at the time of either LCA mentioned Clarivein. To the best of Plaintiff's knowledge, the first mention of Clarivein in an LCD was in a January 1, 2017 amendment to LCD

L34209; however, this amendment occurred after Plaintiff stopped performing the Clarivein procedure in March 2016 and so is not relevant to the present case.

67.     Plaintiff timely appealed the series of Redetermination Decisions by Noridian to a qualified independent contractor ("QIC"), C2C Innovative Solutions, for reconsideration of the Redetermination Decisions.

68.     On August 17, 2017, the QIC issued its first Reconsideration Decision which was only partly favorable.  Subsequently, four other Reconsideration Decisions have followed to date; of the four additional Reconsideration Decisions, three have been partly favorable, all based on the identical rationale set forth in the August 17, 2017 decision.  The total amount at issue in these four partly favorable Reconsideration Decisions is about $770,000, which is only a portion of the approximately two million dollars total at issue.  In each of the four partly favorable Reconsideration Decisions to date, the QIC held that Noridian's application of CPT Code 36470 ("Injection of sclerosing solution, single vein") or 36471 ("… multiple veins") was incorrect because Clarivein involves far more than simple application of a chemical sclerosing agent.  Instead, the QIC suggested that the correct code was 37799, which applies to "Unlisted procedure, vascular surgery" and suggested, but did not mandate, that this code be reimbursed at a rate that was somewhat higher than that for CPT Code 36470, but which was still far less than that for CPT Code 37241. (*Id.*: "The documentation supports allowing use of the service with CPT Code 37799. … The QIC does not have authority to tell the Contractor [Noridian] how to price unlisted codes.")  The Reconsideration Decisions note that Noridian may begin immediate recoupment beginning 31 days after the date of the letter(s), which would be on or after **September 17, 2017** for the first Reconsideration Decision, dated August 17, 2017.  However, because Noridian is apparently still in the process of re-computing the appropriate amount of compensation, and will presumably send out a new overpayment demand, recoupment has not yet begun.  However, recoupment is expected to begin as soon as such new demand is sent out, **which may be any day**

1   **now**.  On or about October 2, 2017, Plaintiff timely submitted a written request for

2   hearing before an ALJ on the August 17, 2017 Reconsideration Decision, and

3   Plaintiff  has continued to submit timely requests for an ALJ hearing on the

4   subsequent Reconsideration Decisions received.  42 C.F.R. § 1002(a).

5       69.    The fifth Reconsideration Decision received thus far, dated September 7,

6   2017, was entirely favorable and held that CPT Code 37241 had, in fact, been

7   properly used.  However, that decision only applied to about $15,000, a far lesser

8   amount than in the four partly favorable decisions.

9       70.    However, the great bulk of Reconsideration Requests with respect to

10  Plaintiff have not been rendered yet.  Plaintiff will seek to amend this complaint to

11  add allegations of subsequent Reconsideration Appeals as they are received.

12  **VIII.  IRREPARABLE HARM**

13      71.    As noted in paragraphs 14-17, *supra*, Plaintiff is owned and operated by

14  Dr. Norman Baron, a general surgeon, in the City of Brawley in Southern California,

15  who is 73 years old.  Dr. Baron is nearing retirement age.  Brawley is an underserved,

16  largely low-income community with a significant elderly population, and

17  approximately a quarter of the population lives below the poverty line.  Brawley is

18  about 120 miles away from the nearest major city, San Diego, and so Dr. Baron's

19  patients would be greatly burdened by having to switch providers.

20      72.    Although he has not been involved with the Clarivein procedure since

21  March 2016, Dr. Baron's <u>current</u> practice consists of work with a clinic in Brawley

22  whose client base is about 80 percent Medicare.  He would be fired from his job, be

23  forced to stop practicing completely, and probably also be bankrupted, if immediate

24  recoupment of the overpayment demand is not enjoined pending the outcome of a

25  hearing before an ALJ.  As noted, the total amount at issue is about two million

26  dollars.  He and his wife will also likely lose their entire retirement savings if an

27  injunction does not issue.

28

# Count I

## No Review At All ("*Illinois Council*" Exception)

73.   Paragraphs 1 through 72 are incorporated by reference as if fully set forth in Count I.

74.   In *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 19, 120 S.Ct. 1084, 1097 (2000) ("*Illinois Council*"), the U.S. Supreme Court held that, in situations where the ordinary administrative appeal process would amount to "no review at all" of the claim, the administrative appeal process may be bypassed and 28 U.S.C. § 1331 invoked.  Such jurisdiction exists where going through the ordinary administrative appeal process would "amount to the "practical equivalent of a total denial of judicial review."  *Id.* at 20, 120 S.Ct. at 1097.  This has sometimes been referred to as the "*Illinois Council* Exception."

75.   In the present case, Plaintiff has no means to challenge recoupment of Medicare payments.  Such recoupment is immediately permitted upon the issuance of a Reconsideration Decision by the QIC, which has already happened in this case.  42 U.S.C. § 1395ddd(f)(2)(A); 42 C.F.R. § 405.379(f).  As a result, Plaintiff has no means available at all to challenge Noridian's recoupment efforts on behalf of the Secretary.

76.   While it is true that Plaintiff can ultimately challenge the overpayment determinations through the remaining steps of the administrative appeal process, he has no means to challenge the recoupment via the administrative review process.  To put it another way, Plaintiff cannot exhaust administrative remedies with respect to recoupment because he simply does not have any.  Neither an Administrative Law Judge nor the Medicare Appeals Council has the authority to order Noridian to cease and desist from immediate recoupment from Plaintiff, pending the outcome of their determinations.  *See* 42 C.F.R. § 405.376(j) (refusal to terminate recoupment is not appealable via the administrative review process.)

FENTON LAW
GROUP LLP

77.     In addition, as a practical matter, Plaintiff has no means to review the recoupment because any possible relief he might receive at the end of the administrative appeal process, by setting aside the overpayment determinations, would come far too late to help Plaintiff.  The many years of delay would result in Plaintiff's economic destruction.

78.     Accordingly, pursuant to 28 U.S.C. § 1331, this Court has jurisdiction to grant injunctive relief, enjoining Defendants from recoupment against Plaintiff until after the administrative appeals process is fully completed.

<div align="center">

**Count II**

**<u>Mandamus Relief</u>**

</div>

79.     Paragraphs 1 through 78 are incorporated by reference herein as if fully set forth in Count II.

80.     In *Elliott v. Weinberger*, 564 F.2d 1219, 1225-26 (9th Cir. 1977), *aff'd in part and rev'd in part on other grounds by Califano v. Yamasaki*, 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979), the Ninth Circuit Court of Appeals held that the "traditional limited scope of mandamus" encompassed suits "to compel [the Secretary of Health and Human Services's] compliance with due process requirements."  *Elliot*, 564 F.2d at 1226; *see also Powderly v. Schweiker*,  704 F.2d 1092, 1095 (9th Cir. 1983) (permitting mandamus review of Medicare-related matter that raised purely procedural issues rather than addressing the merits); *Briggs v. Sullivan*, 886 F.2d 1132, 1142 (9th Cir. 1989) (same).  This result is nearly unanimous among all Circuits, as noted by *Randall D. Wolcott, M.D., P.A. v. Sebellius*, 635 F.3d 757, 765 (5th Cir. 2011) (citing *Briggs* among other cases and noting that virtually all Circuits except the First and Eleventh have held that 28 U.S.C. § 1361 " 'provides jurisdiction in cases challenging the procedures used in administering ... benefits but unrelated to the merits' of the benefits claim" and that the First and Eleventh Circuits, which had not yet occasion to reach that issue, are still open to so ruling.)

81.     Mandamus is available to compel a federal officer to perform a duty if "(1) the individual's claim is clear and certain; (2) the official's duty is nondiscretionary, ministerial, and so plainly prescribed as to be free from doubt, and (3) no other adequate remedy is available." *Patel v. Reno*, 134 F.3d 929, 931(9th Cir. 1998).

82.     Pursuant to 42 U.S.C. § 1395ff(d)(1)(A) and 42 C.F.R. § 405.1016, the Secretary has a clear and non-discretionary duty to provide Plaintiff with a fair and impartial hearing before a neutral ALJ and to provide an ALJ decision within 90 days of Plaintiff's timely and valid request, the first of which Plaintiff submitted on October 2, 2017.  These are nondiscretionary duties plainly prescribed by statute and regulation.  *See e.g. Patel v. Reno*, 134 F.3d 929, 932-933 (9th Cir. 1997) (issuing writ of mandamus ordering compliance with duty under 22 C.F.R. § 42.81 to issue a decision on visa application.)

83.     However, as discussed in detail in paragraphs 54-60, *supra*, the Secretary has admitted that his Office of Medicare Hearings and Appeals is currently incapable of complying with this statutory mandate.  Existing regulations do not provide for a stay of recoupment of alleged overpayments pending the outcome of an ALJ hearing, notwithstanding that providers like Plaintiff will have to wait some four or more years to obtain a fair and impartial hearing before an ALJ.  Even if Plaintiff were to "escalate" this case after not receiving a timely ALJ decision, the Medicare Appeals Council is not required to grant Plaintiff a hearing.

84.     The failure to provide Plaintiff with a hearing in a timely manner would constitute a violation of its due process rights.

85.     If recoupment of Plaintiff's Medicare receivables begins as soon as a revised overpayment demand is received, which may be any day now, Plaintiff would be forced to cease its practice forever will be precluded from ever having a fair and impartial hearing relating to the billing dispute described herein.

86.     Because recoupment and the refusal to terminate recoupment are not new initial determinations that may be appealed, *see* 42 C.F.R. §§ 405.376(j) and 405.926(e), Plaintiff has no other adequate remedy.

87.     Requiring the Secretary to provide Plaintiff with a fair and impartial evidentiary hearing and decision from a neutral ALJ on the underlying billing dispute within 90 days of Plaintiffs' timely and valid request for such review, as mandated by Congress, will not harm the defendants and is in the public interest.  In the alternative, the issuance of injunctive relief prohibiting recoupment until an opportunity for hearing and decision by a fair and impartial ALJ has occurred will not harm the Defendants and is in the public interest.

## Count III

### Procedural Due Process (*Mathews v. Eldridge* Waiver)

88.     Paragraphs 1 through 87 are alleged and incorporated herein as if fully set forth in Count III.

89.     As a general matter, Plaintiff notes that, "[a]bsent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction." *Califano v. Yamasaki*, 442 U.S. 682, 705, 99 S.Ct. 2545, 2569 (1979) (affirming authority of federal courts to issue injunctions in actions where courts have jurisdiction under 42 U.S.C. § 405(g).)

90.     In addition to the right to mandamus review, Plaintiff also may also seek review pursuant to 42 U.S.C. section 405(g), where the exhaustion of administrative remedies requirement is subject to waiver under *Mathews v. Eldridge*, 424 U.S. 319, 330, 96 S.Ct. 893, 900 (1976).

91.     For waiver to apply, "[t]he claim at issue must be (1) collateral to a substantive claim of entitlement (collaterality), (2) colorable in its showing that refusal of the relief sought will cause an injury which retroactive payments cannot remedy (irreparability), and (3) one whose resolution would not serve the purposes of exhaustion (futility)." *Cassim v. Bowen*, 824 F.2d 791, 795 (9th Cir. 1987).

92.     The claim in the present case is entirely collateral to the substantive claim of entitlement, in that Plaintiff is only seeking, via this Court action, injunctive relief to preserve the *status quo* pending the outcome of a fair and impartial hearing before an Administrative Law Judge.  This claim is entirely one of procedural due process, which is a collateral challenge that will not require the Court to deal with the substantive merits of the case.  *D&G Holdings, LLC v. Sylvia Matthews Burwell*, 156 F.Supp.3d 798, 815 (W.D. La. 2017).

93.     The procedures used by CMS to recoup substantial and dubious alleged overpayments from Plaintiff based on the determinations of entities that have an established track record of overstating overpayments 70% of the time, when Plaintiff has a substantial likelihood of success in overturning the post-payment review underlying the alleged overpayment determinations, are constitutionally inadequate, because they force Plaintiff to incur a devastating loss that will prevent it from ever accessing the appeals process or obtaining a fair hearing as mandated by Congress.

94.     To satisfy the requirements of due process required under the Fifth Amendment of the United States Constitution, the Secretary must afford a provider an administrative hearing and an opportunity to challenge the overpayment determinations before a fair and impartial decision maker before imposing a self-help recoupment remedy that would force Plaintiff out of business, at least where, as here, Plaintiff have demonstrated significant reason to doubt the validity of the alleged overpayment determinations underlying the threatened recoupment.  This is particularly true in that the Secretary is required to demonstrate that the Plaintiff was not "without fault" in providing and billing for the services at issue, a matter which requires more than a paper review but rather an oral hearing in order to adequately determine the factual issues involved.  *See e.g. Califano v. Yamasaki*, 442 U.S. 682, 696-697, 99 S.Ct. 2545, 2555-2556 (1979) (holding that due process requires a prerecoupment hearing for Social Security beneficiaries and not just a written, paper review); *Mount Sinai Hospital of Greater Miami v. Weinberger*, 517 F.2d 329, 341,

COMPLAINT FOR INJUNCTIVE RELIEF

fn. 22, 342, fn. 26 (5th Cir. 1975) (noting that Congress placed providers on equal footing with beneficiaries in enacting analogous "without fault" provisions applicable to both providers and beneficiaries in 42 U.S.C. §§ 1395gg and 1395pp.)

95.     Defendants are thus threatening to deprive Plaintiff of its property and liberty interests in or associated with its Medicare payments, healthcare services, and goodwill without due process of law, in violation of the Fifth Amendment of the United States Constitution and other applicable law.  Such action threatens to cause irreparable harm to Plaintiff and the elderly patients it serves.  The issuance of injunctive relief prohibiting such recoupment until such due process has been had will not harm the Defendants and is in the public interest.

### Count IV

### *Ultra Vires* Action

96.     Paragraphs 1 through 95 are alleged an incorporated herein as if fully set forth in Count IV.

97.     An *ultra vires* act by an agency is one where the agency has exceeded its statutory or constitutional power to act.  *City of Arlington. Tex. v. FCC*, 590 U.S. 290, 297, 133 S.Ct. 1863, 1869 (2013).  For agencies, "[b]oth their power to act and how they act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is *ultra vires*."  *Id.*

98.     Defendants are required to provide Plaintiff with an ALJ hearing and decision within 90 days from the date of receipt of a timely written request, which Plaintiff is in the process of preparing with respect to the August 17, 2017 Reconsideration Decision by the QIC.  42 U.S.C. § 1395ff(d)(1)(A) and 42 C.F.R. § 405.1016(a).  Their failure to do so would be an improper behavior that constitutes an *ultra vires* action.

99.     Defendants are threatening to recoup Plaintiff's Medicare payments even though they cannot and will not provide the ALJ hearing within the required time frame.  The Court should enjoin Defendants from engaging in such *ultra vires*

1  actions against Plaintiff, actions which are contrary to the limitations on the

2  Defendants' authority as set forth in the Medicare Act.

3  <center>**Count V**</center>

4  <center>**Preservation of Rights under Section 705 of the APA**</center>

5  100.    Paragraphs 1 through 99 are alleged and incorporated herein as if fully

6  set forth in Count V.

7  101.    In relevant part, the Administrative Procedure Act provides that "[o]n

8  such conditions as may be required and to the extent necessary to prevent irreparable

9  injury, the reviewing court, including the court to which a case may be taken on

10  appeal from or on application for certiorari or other writ to a reviewing court, may

11  issue all necessary and appropriate process to postpone the effective date of an

12  agency action or to preserve status or rights pending conclusion of the review

13  proceedings." *See* 5 U.S.C. § 705.

14  102.    This Court is a "reviewing court" and a "court to which [this] case may

15  be taken on appeal" pursuant 42 U.S.C. §§ 405 and 1395ii; and 42 C.F.R. § 405.1136

16  *et seq*.

17  103.    Plaintiff has meritorious challenges to the billing dispute underlying the

18  threatened recoupment from Plaintiff and will vigorously assert its arguments and

19  defenses during the administrative appeals process that has already been initiated, and

20  which will be accomplished as promptly and expeditiously as the Secretary can

21  accommodate.

22  104.    In the meantime, if immediate injunctive relief is not granted to

23  "postpone the effective date of agency action" (i.e., recoupment from Plaintiff against

24  Plaintiff's future Medicare payments), and to "preserve [Plaintiff's] status or rights

25  pending conclusion of the review proceedings," Plaintiff's ultimate right to judicial

26  review in this Court will be eliminated because Plaintiff will cease to exist and be

27  forced into bankruptcy long before such review occurs.

28

FENTON LAW
GROUP LLP

<center>COMPLAINT FOR INJUNCTIVE RELIEF</center>

105.   Accordingly, pursuant to 5 U.S.C. § 705, issuance of the injunctive relief sought in this case is necessary and appropriate in order to prevent irreparable injury and to preserve the Court's jurisdiction to review the result of the administrative appeals process related to the underlying billing dispute.

106.   If injunctive relief is granted, and the result of the administrative process favors the Defendants, the only arguable harm to Defendants will be that recoupment will have been delayed until after a hearing before an ALJ.  Inasmuch as a premature recoupment would almost immediately force Plaintiff out of business (thereby ending Medicare payments available for recoupment), there is little to no benefit to Defendants of immediately recouping Medicare payments as opposed to beginning recoupment after the hearing before an ALJ when the status of the billing dispute has been determined.  The potential that Defendants will suffer any harm if injunctive relief is granted is speculative and negligible, and the amount of any harm, if any, would be minimal.

107.   The injunctive relief requested by Plaintiff will not adversely affect the public interest.  The public interest is in no way served by an unwarranted and accelerated shutdown of medical practices providing services to elderly patients based upon a billing dispute that – if the administrative and judicial review process is permitted to run their course – will most likely be resolved in favor of the Plaintiff.

108.   Based upon the irreparable harm demonstrated above, a temporary restraining order should be issued enjoining Defendants from recouping from Plaintiff, until such time that a hearing may be held on Plaintiff's request for preliminary injunction pursuant to Rule 65, FRCP.

109.   Based upon the irreparable harm demonstrated above, a preliminary injunction and permanent injunction should issue enjoining Defendants from recouping from Plaintiff, prior to providing Plaintiff with a hearing before an impartial and unbiased ALJ.

WHEREFORE, Plaintiffs respectfully prays for the following relief:

1.    That this Court issue a Temporary Restraining Order pursuant to Rule 65(c) prohibiting the Defendants from recouping from Plaintiff, prior to completion of the administrative process, upon such bond, if any, as the Court determines is reasonable;

2.    That the Court order Defendants to appear within ten (10) days to show cause why said Temporary Restraining Order should not remain in effect as a preliminary injunction pending the exhaustion of the administrative remedies; and

3.    That this Court issue a preliminary and permanent injunction prohibiting the Defendant from recouping from Plaintiff, prior to completion of the administrative processes, upon such bond, if any, as the Court determines is reasonable.

4.    In the alternative, that the Court issue a writ of mandamus, ordering that he be provided an ALJ hearing, pursuant to 42 U.S.C. § 1395ff(d)(1)(A) and 42 C.F.R. § 405.1016, and an ALJ decision, within 90 days of Plaintiff's timely and valid request, the first of which Plaintiff submitted on October 2, 2017.

Respectfully submitted,

DATED: October 17, 2017      FENTON LAW GROUP, LLP


By  s/ Dennis E. Lee
DENNIS E. LEE
Attorneys for Plaintiff BARON AND BARON
MEDICAL CORP.
E-mail: dlee@fentonlawgroup.com